IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| BRENDA MITCHELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:10CV758-SRW |
| | ) | (WO) |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF OPINION**

Plaintiff Brenda Mitchell brings this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying her application for a period of disability and disability insurance benefits and her application for supplemental security income under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

**BACKGROUND**

Plaintiff completed twelfth grade in 1997. (R. 128, 152).[1] From 1997 through 1999, she worked at Bes Pak on an assembly line. In 2000 and 2001 she worked through some

---

[1] Plaintiff testified that she did not graduate from high school, but completed "[her] equivalence in the 12th" without receiving a GED when she received a certification in 2001 as a certified nursing assistant. (R. 45).

temporary staffing agencies and, from 2001 to 2003, was employed as a certified nursing assistant. Plaintiff was a self-employed hair stylist from 2004 to 2005. From June through September 2005, she was an assembler for Glovis America, and she worked from May through September 2006 as a packer for Russell Corporation. (R. 53-54, 140-42, 149, 150-63, 198).[2]

When plaintiff was twenty-nine years old, she protectively filed the present application for disability insurance benefits and supplemental security income, alleging disability since September 1, 2006, due to "nerves," severe back pain with headaches, memory loss and sinus problems. (R. 70, 124-30, 144, 147-48). She reported, however, that she was taking no medication for her "stress disorder" and that she took over-the-counter medication for pain when she had bad headaches. (R. 178). On June 6, 2007, plaintiff told a disability claims examiner that she took no medication and had received no treatment for her nerves and memory loss and that these do not affect her ability to function on a day-to-day basis, that her medications control her sinus problems, and that – while she had no back injury – her back pain was her major problem. (R. 179).

Disability Determination Service ("DDS") requested treatment records from plaintiff's primary care provider, Montgomery Primary Health Care; the records provided by the clinic included only two dates of service. Plaintiff was treated on August 7, 2006, for complaints of sinus congestion and drainage; the physician, Dr. Folashade, diagnosed acute sinusitis and

---

[2] Plaintiff testified at the hearing that she last worked on a full-time basis in 2001. (R. 33).

upper respiratory infection. Plaintiff's physical examination was noted to be normal, except for her ENT symptoms. (See R. 150, 207-08). Plaintiff returned to the clinic on April 11, 2007, to have her blood pressure checked. (R. 206).[3]

DDS sent plaintiff to Dr. James Colley for a consultative physical examination. During the July 6, 2007, examination, plaintiff told Dr. Colley that she had "chronic low back pain for approximately a year, possibly secondary to a motor vehicle accident five and a half years ago." She stated that she had "no difficulty sitting," but that her back pain radiated down both legs to her feet, and she had paresthesias in her feet "when she stands for long periods of time, after approximately six hours." (R. 209). Plaintiff reported occasional left shoulder pain. She also indicated that, since she lost her father two years previously, she has had throbbing headaches about three times each month which last for two to three days, are associated with nausea, photophobia, and phonophobia and are not relieved with over-the-counter medication. (R. 209-10). Plaintiff stated that she "can do yard work for about 4-5 hours before she takes a break" and that she "can do housework." She told Dr. Colley, "I hear voices."

Dr. Colley observed that plaintiff had no problems getting on the examination table; had normal gait, station and coordination; could squat 100% and get back up without assistance and could tandem walk and walk on her heels and toes; and had a negative straight leg raise. He found "no paravertebral muscle spasms, tenderness, crepitus, effusions,

---

[3] Records submitted by plaintiff's counsel to the ALJ on August 18, 2009, after the administrative hearing, included a treatment note showing that plaintiff sought treatment at the Jackson Hospital emergency room on October 21, 2006 for a hemorrhoid. (Exhibit 8F, R. 250, 269-72).

deformities or trigger points[,]" and "[n]o clubbing, cyanosis , or edema."  While plaintiff's left shoulder was tender during the physical examination, she had no pain on full active and passive range of motion of that shoulder.  Her grip strength, flexion and extension in her upper extremities and lower extremity strength were 5+/5, and Dr. Colley observed normal muscle bulk and tone and no atrophy.  Dr. Colley diagnosed: (1) "Myofacial low back pain versus mild degenerative disk disease[;]"[4] "[p]ossible migraine headaches[;]" sinus headaches; and mild posterior left shoulder strain.  (R. 210-13).

Late that afternoon, plaintiff reported to the Jackson Hospital emergency room, stating that she was there to have an "x-ray of back and CT of brain for disability."  She complained to the triage nurse of "headaches and back problems – onset 9/06."  (R. 264).[5]  The CT scan performed that day was abnormal, showing a "tiny focus of slightly increased density at the gray white junction involving the left parietal lobe[.]" (R. 268).  Plaintiff was sent home and advised to see her doctor or to return to Jackson Hospital for a recheck on July 8th.  (R. 265). Plaintiff returned to Jackson Hospital on July 8, reporting that her headache had resolved. The repeat CT scan was normal. (R. 260-61). The radiologist's report states, "The brain parenchyma is normal in density and structure. The ventricles are normal size and configuration.  The surrounding soft tissues and osseous structures are unremarkable.  I see no abnormality in the left parietal lobe in the area of a questionable abnormality described

---

[4] At the time of Dr. Colley's examination, plaintiff was scheduled for lumbar x-rays. (R. 209). The x-rays revealed a Staghorn calculus (stone) in plaintiff's left kidney and a "normal lumbar spine." (R. 209, 214, 216-17).

[5] In a separate record, an examining nurse circled the phrase, "States no problems" under the heading "Musculoskeletal." Under "Psychiatric," the nurse wrote "Hear voices."  (R. 266).

on the previous exam."  (R. 262).

Plaintiff's claims were denied initially on July 23, 2007.  (R. 69-82).  On August 30, 2007, plaintiff sought treatment at Montgomery Primary Health Care, complaining of pain in her left side below her abdomen at a left of 9 on a scale of 10.  (R. 227).  She also complained of frequent pains in her upper and lower back, excruciating headaches, and that she was hearing voices.  The nurse's note reads, "Pt. state 'I'm hearing voices, the voices are telling me to do things to myself.[']"  The nurse sent plaintiff to the Baptist Medical Center emergency room.  (R. 225).  Plaintiff was admitted to Baptist Medical Center that day.  In an examination the following day, plaintiff reported no previous mental health treatment.[6] She stated that she had pain in her side and headaches that had increased recently.  She reported a "depressed mood with social withdrawal and loss of interest for a long time" and that she had been "hearing voices since the death of her father in 2004."  She scored 30 of 30 on a mini-mental status examination. Under "Medical Problems," the examining physician wrote, "Medical problems include hypertension, headaches, bronchitis/allergies."  Plaintiff's admission diagnoses were "[m]ajor depression with psychotic features, rule out schizophrenia," and "[p]sychotic symptoms, depression."  (R. 243-45).  Dr. David Harwood discharged plaintiff from the hospital on September 4, 2007 "in improved condition," with a discharge diagnosis of major depression, medication prescriptions, and instructions to follow up at Lowndes Mental Health.  (R. 242).  The following day, Montgomery Primary

---

[6] Plaintiff testified at the administrative hearing, also, that she had no mental health treatment before her hospitalization.  (R. 39).

Care called in prescriptions to CVS pharmacy for Darvocet, Singulair, Seroquel, Bactrim and Celexa, and scheduled plaintiff for a follow-up appointment with a nurse practitioner on September 17th and an appointment with Dr. Mejer on October 18th for treatment of plaintiff's depression. (R. 225).[7] At her follow-up appointment on September 17, 2007, plaintiff reported a pain level of "0." (R. 223). The nurse practitioner diagnosed migraine headache and depression. (R. 222). Plaintiff did not appear for an appointment scheduled for July 25, 2008, ten months later. (R. 222).

On August 27, 2008, plaintiff went to the Jackson Hospital emergency room, complaining of a left-sided headache off and on since being involved in a motor vehicle accident three weeks earlier, on August 7, 2008. She stated that she "was not seen after the accident until today." She also complained of sinus congestion, a sore throat, left ear pain, and "mild bilateral shoulder pain." (R. 253-54). She reported no nausea, vomiting, photophobia, scotomata or flashing lights. Her headache had developed gradually over a period of several hours and was "more nagging than serious." On examination, the physician noted that plaintiff "appear[ed] to be comfortable." She had a "local spasm of cervical muscles" and "an area of local muscle spasm/tenderness over the lower back." The physician diagnosed a tension headache and cervical strain and advised her to follow up with her physician in three to five days. (R. 255-56).

---

[7] In "recent medical treatment" forms completed before her administrative hearing, plaintiff lists Dr. Mejer as a medical provider who had treated or examined her, with treatment dates of February 27, 2009 and April 24, 2009. (R. 193, 195). At the administrative hearing, she testified that he is her psychologist and she had seen him every three months for the previous two and a half years. (R. 40). However, plaintiff did not provide any treatment notes from Dr. Mejer.

6

Plaintiff returned to Montgomery Primary Care for follow up on September 3, 2008. She reported that x-rays taken at Jackson Hospital were negative. Plaintiff was diagnosed with muscle spasm, headache, and sinusitis. (R. 221). Plaintiff returned for follow up on October 15, 2008, complaining of a "leak" in her left ear and that she still had pain in her neck, shoulder and back. She was diagnosed with left otitis media, shoulder and neck pain, and was scheduled to see Dr. Kenneth Taylor, and orthopedic physician, on October 23, 2008. (R. 220). Plaintiff next returned to the clinic four months later, on February 16, 2009. She reported that she went to see the orthopedic doctor but he refused to see her anymore because she "missed so many appt." She was diagnosed with shoulder and neck pain. (R. 219).[8]

On January 12, 2009, plaintiff sought treatment from a chiropractor, Dr. J. Robert Hollis, Jr., complaining of pain in her neck, upper back, lower back and both legs. She stated that her condition had existed since her August 2008 automobile accident and that she had similar conditions in the past due to another motor vehicle accident on April 7, 2007. On physical examination, plaintiff had "no antalgic posture," and her cervical and lumbar range of motion were within normal limits. She had "mild to moderate spasm in the cervical, thoracic, and lumbar paraspinal muscles," and Dr. Hollis concluded that "[j]oint dysfunction [was] present at C5, C6, C7, T4, T5, T6, L4, L5 and both SI joints." (R. 288). Plaintiff's sensation and tandem walking were intact, she was able to stand on her heels and toes, and her deep tendon reflexes were 2+ bilaterally. She had no atrophy in her upper or lower

---

[8] Plaintiff did not provide records of her treatment by an orthopedic doctor.

extremities, and muscle strength was 5/5 in all tested muscle groups. Cervical x-rays revealed "some straightening of the normal cervical lordosis," but disc spaces were well-maintained. Dr. Hollis concluded, "I believe this patient has sustained a sprain and strain type injury to both her cervical and lumbar spine[,]" and he planned to treat her "using physical therapy modalities such as ultrasound and interferential along with chiropractic manipulation." (R. 289).

      Plaintiff saw Dr. Hollis three times a week for the next six weeks. Her treatment visits then decreased to twice weekly four weeks thereafter, once a week for four weeks, once after a period of two weeks, then monthly for a couple of months thereafter. Her final visit of record was on August 13, 2009, seven weeks after her most recent previous visit and a month after the administrative hearing. (Exhibit 9F). The progress notes for each visit after the initial visit were substantially the same throughout plaintiff's course of treatment, with the only differences being plaintiff's reported pain and the interval at which the next visit was to be scheduled. Dr. Hollis noted "mild muscle spasm in both cervical and lumbar paraspinal muscles" and "[j]oint dysfunction ... at C5, C6, C7, T4, T5, T6, L5, and both SI joints" in every visit except the first,[9] that his diagnosis "is unchanged from the last documented

---

[9] In the first visit, he had also noted joint dysfunction at L4 and mild *to moderate* muscle spasms. (R. 288)(emphasis added). In plaintiff's brief, plaintiff's counsel has misquoted the record, arguing that on August 13, 2009 – after eight months of chiropractic treatment – plaintiff continued to have "'mild to moderate spasm, in the cervical, thoracic, and lumbar paraspinal muscles[.]'" (Plaintiff's brief, p. 11)(citing Tr. 318). Plaintiff argues that "[t]his evidence is clearly indicative of Ms. Mitchell continuing to seek treatment and relief for her back and neck pain to no avail." (Id.). After the first visit, Dr. Hollis noted only mild spasms, and only in the cervical and lumbar – but not the thoracic – paraspinal muscles. Plaintiff testified at the administrative hearing that she was going to the chiropractor for therapy "where they moderating my pain." (R. 42).

8

diagnosis," and – after describing the same treatment on each visit[10] – that plaintiff "tolerated the procedure well and felt better following it." (Exhibit 9F).

On July 14, 2009, an ALJ conducted an administrative hearing, during which he heard testimony from the plaintiff and from a vocational expert. (R. 29-68). At the hearing, plaintiff testified that she has back, neck and shoulder pains, and throbbing in her legs, and that her pain level on average is a level 10 of 10. She also had been experiencing depression and suicidal thoughts and migraine headaches, and hears voices. (R. 33-36). She testified that she can sit for four hours and stand for about four hours before she needs to sit down. (R. 43). She testified that it is hard for her to stand "most of the time" due to "sprains" in her leg. (R. 43). She also has "like a throbbing kind of feeling" in her arm; she stated that her doctor told her it is "sprains like a muscle spasm thing." (R. 44). On a typical day, she cleans house, does laundry, cooks, and helps her son with homework. She has friends she sees on a regular basis, either at their home or hers. She goes grocery shopping once a month, and is able to walk through the store pushing a grocery cart for two to three hours. She attends church three times each month and is able to sit through the three-hour service "most of the time." Her medications make her feel drowsy and dizzy. She testified, "I have sometime fainted in front of my yard while I had taken my medication during the morning time." (R. 45-51).

---

[10] On each occasion, Dr. Hollis treated plaintiff with "[p]remodulated ultrasound" for "8 minutes per area at 1 W/cm2[,]" "interferrential electrotherapy ... applied to the patient's cervical, upper thoracic and lumbar paraspinal muscles ... for 10 minutes to patient tolerance[,]" and "chiropractic manual therapy." (R. 289, 292-318).

The ALJ rendered a decision on January 20, 2010. He found that plaintiff has "severe" impairments of "myofacial back pain, headache, and depression." (R. 16). He found that plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the impairments in the "listings" and, further, that plaintiff retained the residual functional capacity to perform "sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant can lift or carry occasionally less than 10 pounds, frequently lift or carry less than 10 pounds, frequently balance, stoop, kneel, crouch, crawl, climb ramps and stairs, precluded from climbing ladders, ropes, or scaffolds, precluded from any exposure to hazardous conditions, unprotected heights, dangerous machinery, or uneven surfaces, must work at simple routine task[s] involving no more than simple, short instructions and simple work-related decisions with few workplace changes at unskilled work, frequent interaction with the general public, frequent interaction with coworkers, and frequent interaction with supervisors (R. 17, 20), with restrictions to "very short instructions, and infrequent contact with the public." (R. 17). He concluded that she is unable to perform her past relevant work, but that there are a significant number of jobs in the national economy which the plaintiff can perform. (R. 22-23). The ALJ concluded that plaintiff has not been under a disability as defined in the Social Security Act since the alleged onset date. (R. 23). On July 22, 2010, the Appeals Council denied plaintiff's request for review (R. 1-4) and, accordingly, the decision of the ALJ stands as the final decision of the Commissioner.

**STANDARD OF REVIEW**

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

Plaintiff contends that the ALJ's decision should be reversed because the ALJ failed to apply the Eleventh Circuit pain standard properly and to take into account plaintiff's "longitudinal history of complaints and attempts at relief before issuing a negative credibility finding."[11] Further, she maintains that he erred in rejecting her testimony that her medications cause her to suffer side effects of drowsiness and feeling faint, that she had fainted in her

---

[11] This argument is premised in part, on counsel's erroneous statement of Dr. Hollis' treatment notes in support of his contention that those notes do not show any improvement in plaintiff's condition. (Plaintiff's brief, p. 11). See n. 9, *supra*.

11

front yard, and that she must go to her room and lie down after taking her medication. (Plaintiff's brief, pp. 6-12). All of the arguments advanced by plaintiff go to the ALJ's assessment of her credibility.

In the Eleventh Circuit, a claimant's assertion of disability through testimony of pain or other subjective symptoms is evaluated pursuant to a three-part standard. "The pain standard requires '(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.'" Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005)(quoting Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991)). If this standard is met, the ALJ must consider the testimony regarding the claimant's subjective symptoms. Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992). Although the ALJ is required to consider the testimony, the ALJ is not required to accept the testimony as true; the ALJ may reject the claimant's subjective complaints. However, if the testimony is critical, the ALJ must articulate specific reasons for rejecting the testimony. Id.[12]

---

[12] See also Social Security Ruling 96-7p, 61 Fed. Reg. 34483-01 (July 2, 1996):

> When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements. The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently

Plaintiff contends that the ALJ "failed to provide an adequate basis to reject her testimony[.]" (Plaintiff's brief, p. 9). However, the ALJ stated a number of reasons for rejecting plaintiff's testimony of disabling symptoms, including: (1) the fact that the objective evidence of record does not support her allegations; (2) plaintiff's own testimony that she can sit and stand for four hours each; (3) plaintiff's testimony regarding her daily activities, which included performing chores, caring for her child and helping him with his homework attending church three times per month and working part-time; and (4) the evidence that her "mental issues have resolved to some extent" after her past admission for psychological issues. (R. 22). Additionally, while the ALJ did not discuss the fact that plaintiff continued to seek treatment from her chiropractor over a period of eight months, he discussed the results of Dr. Hollis' initial examination in detail (R. 21)(citing Exhibit 9F) and appended to his decision an exhibit list indicating that Exhibit 9F included fifty-one pages of treatment notes from Dr. Hollis, concluding on August 24, 2009 (R. 28). Thus, it is apparent that the ALJ was aware of plaintiff's continued treatment by Dr. Hollis. "If the ALJ decides to discredit the claimant's testimony, he must clearly articulate explicit and adequate reasons for his decision. ... In articulating its reasons, the ALJ need not specifically refer to every piece of evidence 'so long as [his] decision .... is not a broad rejection which is not enough to enable the [court] . . . to conclude that the ALJ considered her medical condition as a whole.' ... Also, the ALJ may cite the claimant's daily activities." Pritchett v. Commissioner, Social Sec.

---

specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

13

Administration, 315 Fed. Appx. 806, 812 (11th Cir. 2009)(citing Dyer v. Barnhart, 395 F.3d 1206, 1210-11 (11th Cir.2005) and Wolfe v. Chater, 86 F.3d 1072, 1078 (11th Cir.1996)).

Finally, it is apparent from the ALJ's decision that he considered – and partially rejected – plaintiff's testimony of disabling side effects from medication. The ALJ questioned plaintiff at the administrative hearing about side effects of medication and, as plaintiff notes, framed a hypothetical question to the VE incorporating plaintiff's testimony regarding her side effects. (R. 51, 66). The ALJ found plaintiff's testimony regarding side effects of medication to be partially credible, to the extent that it limited her to unskilled work and to an environment with no exposure to hazardous conditions, including unprotected heights, dangerous machinery and uneven surfaces. (See R. 20, 22, 62, 65). The court concludes that the reasons articulated by the ALJ for finding plaintiff's pain testimony to be less than fully credible are both adequate to support his credibility determination and supported by substantial evidence of record and, further, that he did not fail to consider the evidence of plaintiff's chiropractic treatment or her testimony regarding side effects of medication in assessing her credibility and formulating her residual functional capacity. Accordingly, the court rejects plaintiff's contention that the ALJ committed reversible error.

## CONCLUSION

Upon review of the record as a whole and the arguments of the parties, the court concludes that the decision of the Commissioner is due to be AFFIRMED. A separate judgment will be entered.

DONE, this 22nd day of September, 2011.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE